**In the United States District Court
for the District of Kansas**

———————

Case No. 19-cr-40109-TC

———————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

SHAWN CORTEZ MCCOLLEY,

*Defendant*

———————

**MEMORANDUM AND ORDER**

The Government charged Shawn Cortez McColley with one count of intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1). Doc. 1. McColley moves to suppress evidence obtained during a traffic stop and statements that he made following his arrest. Doc. 16. For the following reasons, McColley's Motion to Suppress is denied.

**I**

McColley's charges stem from a traffic stop that occurred along Interstate 70 in rural Ellsworth County, Kansas. During the pre-dawn hours of July 2, 2019, Kansas Highway Patrol Trooper Dylan Frantz parked his patrol vehicle in the median and began watching eastbound traffic. While there, he witnessed and then pulled over an eastbound vehicle that he believed to be following another vehicle too closely in violation of Kansas law. *See* Kan. Stat. Ann. § 8-1523. After a brief exchange with the driver, Frantz obtained consent to search the vehicle, discovering nine bundles of cocaine and one bundle of fentanyl pills. The driver, McColley, has moved to suppress this evidence, claiming it was obtained in violation of the Fourth Amendment. Doc. 16.

1

## A

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As a result, the Supreme Court has recognized that a search or seizure is presumptively reasonable when conducted after a neutral, detached magistrate issues a warrant. *See Katz v. United States*, 389 U.S. 347, 357 (1967). This traffic stop, vehicle search, and arrest, however, were all warrantless.

There are several exceptions to the warrant requirement. For instance, officers can stop a car without a warrant if they have reasonable suspicion—commonly described as a particularized and objective basis for suspecting the particular person stopped of criminal activity—to believe that a traffic violation occurred. *See, e.g.*, *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Reasonable suspicion is a deferential standard, *United States v. Vercher*, 358 F.3d 1257, 1263 (10th Cir. 2004), requiring "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2019).

Every traffic stop must be both justified at its inception and remain reasonably limited in scope to those circumstances. *Bradford*, 423 F.3d at 1156. Once the mission of the initial stop has been accomplished (*e.g.*, writing a warning for a traffic violation), the driver must be allowed to leave unless the officer has reasonable suspicion that other illegal activity has occurred or is occurring, *see Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015), or if the initial detention has become a consensual encounter, *see Bradford*, 423 F.3d at 1158. *See also United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020).

## B

McColley makes two basic Fourth Amendment arguments. First, he contends that Frantz's initial stop was unlawful because Frantz did not have reasonable suspicion to believe that McColley was committing a crime. Doc. 16 at ¶¶ 4–6. Second, he argues that Frantz conducted the stop unreasonably by, among other things, asking him questions outside the scope of the purpose of the stop, *id.* at ¶¶ 6, 10, and by asking him to sit inside Frantz's patrol vehicle while Frantz

completed the paperwork related to the stop, Doc. 21 at 8. Based on the record made by the parties at the suppression hearing, Doc. 22, the following describes the facts pertinent to McColley's arguments.

**1.** While parked on the side of Interstate 70 alone in his patrol vehicle at 5:09 a.m. on July 3, 2019, Frantz observed a car following another within two to four car lengths. Believing that the distance between the two cars was too close in light of existing conditions, *see* Kan. Stat. Ann. § 8-1523, he pulled out and began following the car. After observing the cars still within a close distance to each other, he pulled the rear car over. Frantz then informed the driver of that vehicle, McColley, of the reason for the stop and requested McColley's license and vehicle rental agreement.

After briefly questioning McColley about his travel plans, Frantz ordered McColley to exit his vehicle and sit in the front seat of Frantz's patrol car while Frantz processed the paperwork. While running McColley's identification through a law enforcement database, Frantz asked McColley several questions, such as how he got to Las Vegas (he flew), where he stayed (with friends), name(s) of friends he saw while he was there (Michael), what he does for work (sells cars), and the like. Ultimately, Frantz told McColley that he was only going to give McColley a warning for following too closely, explaining that a safe distance would have been one car length for every ten miles per hour of speed (*e.g.*, seven car lengths for 70 miles per hour) instead of the couple of car lengths Frantz had observed. Then, Frantz returned McColley's license and rental agreement to him and said, "Just a warning. You're good to go. Ok. Be safe." McColley thanked Frantz and opened the patrol car door to leave.

**2.** After McColley opened the door, Frantz asked McColley if he could ask him some additional questions.[1] McColley agreed.

---

[1] This effort, akin to the "Trooper Two-Step," is not an uncommon practice for Kansas Highway Patrol officers seeking to signal the end of a stop but then quickly engage a driver in additional, consensual conversation. *See generally United States v. Ahumada*, No. 14-40088, 2015 WL 685845, at *10 (D. Kan. Feb. 18, 2015) (collecting Tenth Circuit cases on the practice in Kansas and beyond). The Tenth Circuit has sanctioned this practice by holding that, absent an indication of coercion, verbal cues ending the encounter and/or the return of a citation and paperwork will render following conversation consensual. *Id.*

Frantz indicated during his testimony that he had additional questions because of a variety of observations made during the brief encounter. For one, he noted inconsistencies in McColley's responses to his questions. When Frantz first spoke to McColley and asked about his travel plans, McColley said he was coming from Las Vegas, had been there since Monday visiting friends, and was on his way back to his home in Alpharetta, Georgia. But once inside Frantz's vehicle, McColley said he had been visiting family and had no ready explanation for why he was in Kansas, when the most direct route from Las Vegas to Alpharetta would have kept McColley well south of the state.

Frantz began this additional questioning by telling McColley there was a lot of marijuana, cocaine, and methamphetamine activity along the interstate highway and asked McColley if there was anything like that in the car. McColley said no and agreed when Frantz asked if he could search the car. During that search, Frantz found nine bundles of cocaine and one bundle of fentanyl pills. Based on the discovery of the drugs, Frantz arrested McColley. After his arrest, McColley made an incriminating statement to law enforcement officers.

## II

McColley fails to identify a Fourth Amendment violation in this encounter. The initial traffic stop was permissible because Frantz had reasonable suspicion to believe that McColley was violating Kan. Stat. Ann. § 8-1523, and Frantz's questioning while checking McColley's documents in his patrol vehicle did not unreasonably extend the traffic stop. Once the initial stop ended, McColley consented to additional questions and then to the search of his car. As a result, the evidence obtained from this encounter will not be suppressed.

## A

**1.** Frantz had reasonable suspicion to initially stop McColley. The Kansas law at issue, Kan. Stat. Ann. § 8-1523, states that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." While the statute does not specify what is considered "reasonable and prudent," the Tenth Circuit has noted the statute compels a judgment based on speed, conditions, and pertinent traffic. *United States v. Vercher*, 358 F.3d 1257, 1260 (10th Cir. 2004).

*Vercher* is instructive. There, a trooper stopped a vehicle traveling eastbound on rural Interstate 70 after observing the vehicle follow another by roughly two car lengths, each doing approximately 70 miles per hour. *Vercher*, 358 F.3d at 1259 (noting the trooper testified a reasonable and prudent speed would have been between 100 to 150 feet, or roughly 8 to 10 car lengths). The Tenth Circuit reversed the district court's conclusion that the Trooper's testimony failed to establish reasonable suspicion for a traffic stop, concluding instead that the Trooper's "observation of the speed and distance was sufficient to form" reasonable suspicion under Kan. Stat. Ann. § 8-1523 to justify a stop. *Id.* at 1260 (Lucero, J.).

McColley cannot succeed on facts materially indistinguishable from *Vercher*. As noted, Frantz testified that he pulled McColley's car over on Interstate 70 while McColley was traveling at 70–75 miles per hour. It was dark outside, but Frantz described clear weather and said he could see both vehicles. He explained that McColley's car was too close to the other vehicle (roughly two to four car lengths) to be considered "reasonable and prudent" on the interstate highway at those speeds. In those conditions, Frantz testified, McColley's car should have been at least seven car lengths behind since he was traveling approximately 70 miles per hour. *Accord Vercher*, 358 F.3d at 1259.

**2.** McColley's contrary arguments fall short. He first argues that the stop was actually "based on [Frantz's] hunch that the car was carrying drugs." Doc. 16 at ¶¶ 4–5. In other words, McColley believes the minor traffic violation was merely pretext for investigating for drugs. *Id.* But as McColley himself recognizes, *id.* at ¶ 6, an officer's subjective motivation for stopping a car is irrelevant: All that matters is whether the officer had reasonable suspicion that this particular motorist violated a traffic law. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)). As noted, Frantz had sufficient suspicion to believe a traffic violation was occurring.

Next, McColley argues that dash-cam video shows McColley's vehicle was "clearly a safe distance behind the car" because the Kansas Noncommercial Driver's Manual cites two seconds as the proper measurement for determining a safe following distance. Doc. 21 at 1, 4, 6–8. This argument fails for multiple reasons.

For one, whether McColley might have been convicted of the traffic violation is irrelevant. The question here is whether there was a

particularized and objective basis for suspecting a traffic violation oc-curred; proof that a crime actually occurred is not required. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2019). Again, that standard has been met.

For another, the video does not plainly contradict Frantz's assess-ment of the distance between vehicles. Played at the hearing, the video shows the two cars traveling within a couple car lengths of each other.

And, finally, the Tenth Circuit has held that both the car-length and two-second measuring methods are permissible metrics for deter-mining whether reasonable suspicion exists under Kan. Stat. Ann. § 8-1523. In *United States v. Hunter*, 663 F.3d 1136, 1143 (10th Cir. 2011), the Tenth Circuit found reasonable suspicion where the officer used the two-second rule. So, too, in *United States v. Worthon*, 520 F.3d 1173, 1181 (10th Cir. 2008), where the Tenth Circuit noted the officer applied the car-length rule.

**B**

McColley also asserts several arguments concerning his interaction with Frantz after the stop commenced. None are persuasive.

**1.** McColley contends that Frantz directing McColley to join him in his patrol vehicle while processing McColley's license and rental pa-pers was unreasonable. Doc. 21 at 8–9. But McColley has identified no authority suggesting that practice is an affront to the Fourth Amend-ment nor offered a doctrinal basis for why it should be impermissible. To the contrary, the Tenth Circuit appears to have tacitly approved it. *See United States v. Santos*, 403 F.3d 1120, 1122 (10th Cir. 2005) (con-cluding a traffic stop was reasonable even though trooper asked driver to join him in his patrol car to issue a warning for speeding); *United States v. Hernandez*, 93 F.3d 1493, 1499–1500 (10th Cir. 1996) (listing cases along the same lines).

McColley suggests the better practice (and one he conceded the Fourth Amendment permits) would have been to direct McColley to sit or stand outside the vehicles. But that engenders a host of dangers to the detained driver and motorists driving along an interstate high-way in the pre-dawn darkness. And McColley offered no meaningful Fourth Amendment basis that would authorize removing the driver from the vehicle to sit or stand beside the patrol car yet prohibit having the driver sit within the patrol car while the officer processes the traffic violation. Instead, it appears that asking a driver to get out of his or

her vehicle during the initial phase of the traffic stop is impermissible only if that relocation prolongs the detention unreasonably. *See, e.g., United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020) (finding no evidence suggesting any unreasonable delay or delinquency when the trooper asked the driver to stand next to his police vehicle during a traffic stop). McColley has not shown that his relocation prolonged the interaction here.

**2.** McColley next argues that Frantz unreasonably prolonged or exceeded the permissible scope of the detention by asking questions unrelated to the reason for the stop. Doc. 21 at ¶¶ 8, 11. These questions included things like McColley's travel to Las Vegas, his accommodations there and who he was visiting exactly, what type of work he does, and the like. Controlling circuit precedent has authorized these and similar types of questions. *Cortez*, 965 F.3d at 839 (dismissing objection to questions that were "farther afield" of officer safety as only "negligibly burdensome").

There is no indication that any of the questions impermissibly prolonged McColley's detention. Here, Frantz asked the disputed questions while processing McColley's license and rental papers. From the time Frantz pulled McColley over until the time Frantz told McColley he was "good to go," fewer than eight minutes elapsed.[2] The questions did not extend the duration of the stop beyond what is considered reasonable and were, therefore, permissible. *See United States v. Mayville*, 955 F.3d 825, 832 n.2 (10th Cir. 2020) (upholding a 12-minute stop because there was no evidence suggesting a "lack of diligence in pursuing the mission of the stop"); *United States v. Morales*, 961 F.3d 1086, 1093 (10th Cir. 2020) (both initial 10-minute traffic stop and continued detention to make a 15-minute call to national law enforcement database were reasonable in duration).

McColley argues that it is unconstitutional to ask questions unrelated to a motorist's travel plans absent reasonable suspicion. Doc. 21 at 9–12. The Supreme Court has held otherwise: an officer's questioning in and of itself does not require any additional Fourth Amendment justification so long as it does not prolong the initial, lawful detention. *Muehler v. Mena*, 544 U.S. 93, 101 (2005); *see also United States v. Stewart*,

---

[2] The video recording shows Frantz pulling McColley over at approximately the 2:13 minute mark of the video. At the 9:26 minute mark, Frantz tells McColley he's good to go and McColley moves to leave Frantz's car. Thus, approximately seven minutes and thirteen seconds elapsed during the initial stop.

473 F.3d 1265, 1269 (10th Cir. 2007) (concluding the nature of an of-ficer's questions has no bearing on whether a Fourth Amendment vi-olation exists). These types of questions are permissible when, as here, they do not extend the stop. *See, e.g., Cortez*, 965 F.3d at 838.

**3.** Finally, McColley contends that Frantz lacked reasonable suspi-cion to conduct the prolonged drug investigation detention. Doc. 16 at ¶ 10. But Frantz did not need (and likely did not have) reasonable suspicion: McColley consensually spoke with Frantz after he was told that he was free to go, answered Frantz's subsequent questioning, and then, during that conversation, agreed to let Frantz search his car. The search did not, therefore, violate the Fourth Amendment.

It is the Government's burden to show the consent was unequiv-ocal, specific, freely given, and free of "implied or express duress or coercion." *United States v. Davis*, 636 F.3d 1281, 1292–93 (10th Cir. 2011). Courts can consider, among other things, the location of the encounter, whether the officer physically restrained the defendant, whether his weapons were displayed, demeanor and tone of voice, length of duration, and whether he advised defendant he had the right to terminate the encounter or refuse consent. *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017); *see also Hunter*, 663 F.3d at 1144–45 (explaining officers are not required to inform defendants that they have the right to terminate the encounter or refuse consent). An encounter is considered voluntary and consensual if "a reasonable person would believe he was free to leave or disregard the officer's request" to engage in further communications. *Hunter*, 663 F.3d at 1145.

Here, the initial encounter concluded when Frantz returned McColley's license and rental documents, communicated a verbal warning for the traffic violation, and told him he was "good to go" and to "be safe." Recognizing his detention had ended and he was free to leave, McColley opened the patrol vehicle door and began to exit. When McColley was exiting the vehicle, Frantz asked whether he could ask him a few questions, and McColley agreed. Controlling precedent confirms that this chain of events is sufficient to establish a break be-tween the initial detention and the subsequent questioning, such that it is considered consensual. *United States v. Mercado-Gracia*, 989 F.3d 829, 837 (10th Cir. 2021) (concluding seven-minute traffic stop prior to the consensual encounter had ended when trooper handed back the driver's documents, told driver he was "free to go," and driver started walking back toward his own car); *Gomez-Arzate*, 981 F.3d at 842

(holding encounter became consensual after deputy returned driver's paperwork).

There is no evidence of coercion influencing McColley's consent. The video confirms that Frantz was the only officer on site at the time. Frantz used a calm voice, never drew his gun or used physical restraints, and although he was dressed in his standard patrol uniform, did not assert or imply that McColley was required to stay in his police vehicle. These points support a finding that McColley, who should have known he was free to leave, voluntarily agreed to the additional questions and subsequent request to search his vehicle. *Compare United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1310 (10th Cir. 2006) (holding encounter did not become consensual where driver did not know his documents had been returned or that trooper had completed writing a warning), *with Bradford*, 423 F.3d at 1159 (finding the encounter was consensual where, despite relocating citizen to the back seat of the patrol car, trooper made no coercive show of authority).

### III

For the foregoing reasons, McColley's Motion to Suppress evidence, Doc. 16, is DENIED.

It is so ordered.

Date: July 30, 2021               s/ Toby Crouse

                                  Toby Crouse
                                  United States District Judge